Edward Pena and Matthew Gossel, you are here on behalf of the estate of Jesse Aguirre v.  Jesse Aguirre as well as Blanca Aguirre and their son, Jesse Jr. May it please the court. On April 12, 2013, Jesse Aguirre was driving a borrowed van with a friend in San Antonio, he hit a curb, he blew out a tire, he caused very minor damage to a neighborhood fence. At that point, Jesse Aguirre leaves his passenger to deal with the damage, he walks towards Highway 90, which at this juncture is about a six-lane highway with a concrete medium, and shortly thereafter, 911, the San Antonio Police Department dispatcher, gets several calls from motorists because there is a man walking on Highway 90, and they say, you know, he appears disoriented. So, San Antonio Police Department dispatches seven, possibly eight, patrol vehicles to the location. One of the vehicles intercepts the passenger that was left dealing with the blown-out tire and the minor damage to the fence, and she is interviewed, and from this friend, they learn that Jesse Aguirre, who was walking on Highway 90, subsequent to the blowout, that Jesse Aguirre had ingested cocaine and alcohol. That is the passenger in the car? Yes, they learn from her that Jesse has ingested cocaine and alcohol, and that he is distraught about a possible breakup of his family and his mother being terminal. When you say they learn, the officers that then are subduing him when he dies were told that he had ingested cocaine? Yes, sir. So, it's not the blue lips alone, it's an explicit statement to them? It's an explicit statement known to each officer. The officer that interviewed her immediately relayed that information to them, and they are proceeding with that information, okay? And it's a quick response, you know, they zero in on Jesse Aguirre, not too far from where this neighborhood situation occurred. There's three officers that arrive at virtually the same time. Christina Gonzalez is the first one out of her car. She pulls her pistol, trains it on Jesse Aguirre, and commands him to come to her, or she'll shoot him. Well, and by this time, another female officer, Jennifer Morgan, likewise pulls her revolver, trains it on Jesse Aguirre, and Roberto Mendez pulls his taser. So, we've got three officers there. Now, the point here that I want to stress is that from the moment that Christina Gonzalez says, come here, Jesse Aguirre comes to her and is handcuffed, presents himself for handcuffing, with his hands behind his back, and the video shows that all of this occurred within 29 seconds. Okay, so you're claiming that Gonzalez's video never shows him walking away from a command. It shows like a second or two of him, but the moment she says, stop, MF, or I'll shoot you, he turns around, he walks back, and within 29 seconds, he is handcuffed with his hands behind his back without incident, without resistance, without cursing, without incident. Okay, now, he is handcuffed on the opposite side of the median, and the officers, Gonzalez, Morgan, and Mendez, flip him over, backwards, onto his head. Before you go too much further, I hope you're going to have some time to tell us what the doctors, the medical doctor and the other expert testified to as to the cause of his death. Yes, sir. Yes, sir. They flip him over onto his head, thank you, and then pick him up and slam him against the front hood of Officer Mendez's vehicle. Officer Mendez is a large man, Jesse Aguirre is a small stature, but stocky, he's bent over very unceremoniously, he's already cuffed, and it's a hot hood of the vehicle because this patrolman has been on duty. What time of night? It's approximately 7 p.m. And what time of year, is this dark now? It's April, it's April, so it's still light, it's light, and we've got a good video from the dash cam videos of three of the vehicles, I think there's a fourth one also, with little pieces of it, but we've got fairly decent video and audio from three of the patrolmen. So it's a hot hood and you're saying he jumps off it, they interpret that as resistance and then they put him down on the ground, is that essentially what you're saying? He doesn't jump off it, he's just kind of squirming, you know, turning from side to side. So it's clear to me that it's because of the hot hood. Now, the district court interpreted that as... Is there any audio on the tape? Yes, yes there is. Does he say anything about it being a hot hood? No, we can't discern anything that's said, but in any event, looking at the video, I don't see how anyone could conclude that he was resisting, trying to flee, or trying to cause problems for the officers that handcuffed him within 29 seconds, because he presented himself. But when you say the girlfriend in the car told them things, is it understood that she told them that the mother, that he may be suicidal and or that he may be trying to kill her? Did she tell them that? That is in the record? Because I guess the split second scenario I'm sure you're sympathetic to is, they're told, guy could be suicidal, may have just tried to kill his girlfriend, now he's in an eight lane highway. That's a very difficult situation for police. So there's no question they should cuff him and control him. Then if you acknowledge he squirms, they may not have known the heat. It would seem to me they would then want to subdue him. So there's no risk of cars flying by. And that gets me to my one legal question, which is, is your position that the Gutierrez case that we wrote 20 years ago controls? That they then used deadly force, even though they didn't hogtie him, they just cuffed and pulled his legs up. Does that have to be your legal argument? I think our best case is Darden. Okay, best case is Darden. But you're familiar with Gutierrez? Gutierrez, absolutely. Gutierrez, we think that in this case, like in Gutierrez, the force brought there was excessive force in violation of the statute. Prone horizontal positioning as to a known intoxicated person is always excessive because it's deadly? The prone position for a drug-affected person for a prolonged period of time. And here we have an additional factor, not in Gutierrez, and that is the sustained pressure. You better stay by the mic. The sustained pressure of four officers applying pressure with their knees and their hands on Jesse Gutierrez's back as he is on the pavement. With his legs up. With his legs crossed and pushed up towards his buttocks. Now, Judge Dennis, to get to your question. He's on his face. He's on his face. He's on his face, a prone position. His legs are put up behind his back, to his back. Yes, sir. Pushed up toward his feet or pushed up towards his buttocks. And they're crossed, and she keeps him there in that position until he dies, okay? The pressure does not relent until he dies. Well, his arms aren't crossed the way you just crossed yours, are they? He's concave. Isn't he concave behind his back? He's concave with his hands behind his back. He's on his stomach and face. The officer crosses his legs and then pushes his feet over towards his buttocks. Now, the medical examiner found this to be a homicide. They also found this to be a situation consistent with excited delirium syndrome. A homicide? Wait a minute. Who said it was a homicide? Yes. We're going to lose your argument if you don't stand right by these arguments being recorded. And if you get away from that microphone, we'd lose your argument. It's not that one. It's the one in the middle. There's a little bar down there right in front of you. There's a microphone. Great. Yes. Yes. It's a rule of homicide as a result of the struggle and excited delirium syndrome and positional asphyxiation. Now, the city's expert basically follows that. In my view, it's not very helpful. It's— What did Dr. Mednick or whatever his name? I'm sorry? Dr. Mednick? Was he your expert? Yes. What did he say? Dr. Midler did a very detailed analysis of the video and of the medical records, interviewed the medical examiner, and rendered an opinion, and tells us the physiology of exactly what the result of crossing his legs, pushing him forward in a prone position with his hands cuffed. I read his report. I haven't been able to read his testimony. Did he stray from his report? He did not. Okay. Well, go ahead and tell us about it. He also tells us the physiology of being cuffed in a prone position. He tells us the physiology of being pushed down on a pavement. And he says there's no doubt in his mind that the turning of the head from side to side, which is the only thing Jesse Geary could do, was an effort to breathe. Okay? And they're also pressing his head down. And he says that's what killed him. Okay? Now, he also finds that it's consistent with excited delirium syndrome. But the judge, I mean the doctor, the only thing he finds is the cause of death. He doesn't testify as to whether the force is excessive or not excessive. In this case, a cause of death or one of the causes of his death is, given his condition, this caused his death. Yes, sir. Or was a cause of his death. Yes, sir. Yes, sir. The medical evidence is the clearest I have ever seen in one of these cases. I understand. But that goes to causation. It goes to causation. Then you've got to show that under the circumstances that it was unreasonable force. Yes, Your Honor. Unless you are arguing that this was deadly, that is, that it was deadly force within the perimeters of the case that we have held that hogtie is deadly force. Yes, sir. What is the difference between this and hogtie? Yeah, that's my question. There is no functional difference between this and a four-point restraint. It is a hogtie, only worse. It's worse because once somebody is hogtied, they're generally left alone in a prone position, which we all know is very dangerous. But here we have the functional equivalent of a hogtie but with the pressure that never relents until he dies. But he's not tied. I mean, and, of course, whenever you talk about excessive force, excessive force in one case may be quite different than another, obviously. And here you take into account the circumstances of his being on a highway, his being somewhat deranged and unpredictable as to what he's going to do next if he does get up, that whenever he does get up, I mean, he's got an eight-line lane highway in which there's traffic going anywhere from 60 to 80 miles an hour up and down the highway. So you take all of that into account. So if you could tell me how that's excessive force under the circumstances. Yes, Judge. And, you know, the best way to answer that question is let's look at the Graham v. O'Connor factors. Was he armed? No. Did he pose an immediate threat? No. Whoa, whoa, whoa. Those are quick statements. No. He's in the middle of an eight-lane highway. He's a threat, a huge threat to himself. They've been told by his girlfriend that he's a threat to himself and to her. You have officers and cars whizzing by. Why isn't all that on both the first two factors quite considerable danger to others and severe crime driving through people's lawns? Because he surrendered within 29 seconds of being told to do so and is under complete control of five officers from then on. From then on, all of the activity, all of the misconduct is official misconduct. It's officer misconduct. Jesse Aguirre is unable to do anything, and he did what we would expect of any citizen to do. He immediately surrenders. Yes, he's in the middle of a highway, and I was going to get to that on the other dangerous accidents and circumstances. Well, you do have a red light there. You'll have some time on rebuttal. All right. Thank you. Thank you.  Mr. Gossin. Thank you, Your Honor. Your Honor, first of all, let me just say that I disagree with—respectfully disagree with counsel's statement that the officers that were involved with Mr. Aguirre on the highway and subduing him out there were aware that he had ingested cocaine. I don't think there's anything in the record that shows that. Well, he says that the officers had talked with the passenger in his car and that she had told him various and sundry things about it. Are you saying that that passenger did not convey to the police at that time that he was under cocaine? There were two sets of officers involved. Actually, one at the site of the accident, one set of officers at the site of the accident, and the other set of officers that were in their vehicles trying to stop Mr. Aguirre while he was on the highway. So I don't believe that there's anything where there is a transmission regarding the fact that Mr. Aguirre had stolen a vehicle and that he had run through some yards and actually it was unclear on the dispatch whether he had hit a house or just some fences. But he went on, obviously, to get— Why do you want us to know that? Because I think that makes a difference in this case, whether it falls under Gutierrez and the other cases similar to Gutierrez or not because I don't think the officers— on their affidavits that they may have thought that he was under some sort of drugs, but they didn't know with certainty what kind of drug it was or whether it was in fact drugs or not. So that being the case, I believe it makes a difference as to whether it falls under the Gutierrez line of cases. You know this language directly. Here's the quote from Gutierrez that would concern me about your position. Viewing these disputed facts in the light most favorable to Gutierrez, the summary judgment record shows the officers knew Gutierrez was under the influence of drugs and they placed him face down in a prone position. The record also shows Gutierrez did not pose a threat of death or serious harm to others. It does. According to their allegations, it seems very similar. They see the blue lips. Whether or not the girlfriend tells him, he's obviously very disoriented and disturbed. Then they put him prone down, at which point he's handcuffed, so he's not a danger to anyone. Well— Why isn't that just sort of Gutierrez? Because Gutierrez—first of all, I guess the first difference would be that there wasn't the dangerous situation involved in Gutierrez. He was much more dangerous. He was fighting them and kicking. But once they got him hogtied, Your Honor, there wasn't. I see. I see. I'm confused as to who you are. I'm sorry? I thought you were the second plaintiff lawyer, but you're not. Oh. You're for the city. That's correct, Your Honor. I understand why you said what you said. Look how balanced you are in argument. Right. But so it really would help me for you to explain why this isn't just sort of a perfect map on top. And your one argument is that he was no danger at the point he was cuffed, but then why would they need to resort to this very extreme police measure or the opposite? Are you talking about Gutierrez? I'm just saying how is this case different than exactly what we ordered in that case? Well, in Gutierrez, first of all, Gutierrez told them himself that he had ingested bad cocaine. Secondly, in Gutierrez, they definitely had him hogtied with the actual four-point restraint, the cord attached to his handcuffs. Thirdly, they put him in the back of a patrol car and transported him for at least ten minutes. I'm not sure how much longer it was, but at least ten minutes, basically without monitoring him. I mean they kind of looked in the back, but it was dark in the back. So when they got to the police station, he was unresponsive at that point. In this case, there was a – he was – Mr. Aguirre was obviously a very dangerous situation. He had – to just go down the excessive force list, the severity of the crime was that he was driving while intoxicated, which this court has held is a serious crime. He also ran through yards, as you yourself, Judge Higginson, pointed out, is a serious crime. May have hit a house, as far as the officers at the scene knew, and was walking across an eight-lane highway. And if you watch the video, he's not only walking across that eight-lane highway. But the video shows that he could have been placed in a police car or he could have been put on the ground sitting up with his back to the median, which would have been a safe – it would have saved his life. Well, Your Honor, I don't – I can't really say that. I mean the medical examiner found that it was excited delirium. His death was caused by excited delirium associated with cocaine and ethanol intoxication. She didn't – the medical examiner did not say that it was a result of her interaction with the police. But I thought he said it was – the examiner said homicide. I'm sorry. I didn't mean to interrupt you, Your Honor. No, no, no, no. I'm interrupting you. But I thought that was seen quite powerfully stated. There was a finding of homicide. There was a – what they called it was because of the police, the struggle with the police, they were going to designate it as homicide. But they do that unless they – there are only a certain number of things they can designate a death. And if it's not accidental or suicidal – and there's one other, I think – but then they call it a homicide. So it's not uncommon for medical examiners to designate – Well, that doesn't concern me as much as the medical doctor's testimony. I don't – I haven't read his testimony. But his report indicates he looked at the video, and he thought that the officers had treated him with – Your Honor. I mean that's impressive testimony to me that what they did was equivalent to hog tying, which we've held in Gutierrez is pretty much an excessive force. Your Honor, in this particular case – so what happens is that when Mr. Geary, as we discussed a little, when Mr. Geary gets to the hood, he starts resisting the officer's attempts to get him under control. They take him over the median. They get him – walk him to the hood of the police car. You can see him sort of swaying back and forth while he's on his way to the police car, which is, in the officer's testimony, he was making it difficult for them to control him. So they put him on the hood of the car, and when you watch the video, you'll be able to see that he's moving his legs, and the officers have testified that what he's doing is that he's again resisting them, trying to get away, or at least trying to get free of their grasp, again on a now four-lane highway with cars going past. And so what they do – what Officer Mendez decides is that he's unable under those conditions. He believes reasonably, I believe, that he is unable to take a chance in trying to get Mr. Geary into the back of a police vehicle, and the better choice would be to put him on the ground and call a wagon. And the video shows that he does call a wagon very shortly after Mr. Geary is placed on the ground. Better choice for the policeman. I'm sorry, Your Honor? Better choice for the policeman, but not the better choice for Mr. Geary. Well, it was an objectively reasonable choice for the policeman, and this case was decided on qualified immunity, so there would have to be a showing that no reasonable officer, objectively reasonable officer— If we construe the medical doctor's testimony and the video in favor of Mr. Geary, it looks like excessive force to me. What's wrong with that argument? Well, Your Honor, if that's the way the court sees the video and the doctor's testimony, then I don't know what to say to that. Is there any evidentiary problem or argument about our considering the medical doctor's expert's testimony about what he saw on the video and how the man was treated, why it was more dangerous to put him on the ground in a prone position the way they did? If I understand the court's question, if you look at the video, I mean, obviously under the Scott and Carnaby cases, if the video depicts that what the doctor is saying is incorrect, then the court does not have to believe what the doctor— Scott doesn't say that. Everybody is misapplying Scott. Okay. Scott, in Scott, Justice Scalia said that with testimony of four or five or six police officers who had chased the man for I don't know how many hours and he's at such and such speed that all of this, including the video, overwhelmed the man's own testimony, the defendant of who Scott was. He testified he didn't speed, he didn't run red lights, he didn't go the wrong way on the thoroughfare. His testimony was totally overwhelmed in that case, but it wasn't just because it conflicted with the video. It conflicted with the whole body of evidence in that case. I don't think you have that here. Okay. I'm sorry. I shouldn't say that because I haven't looked at the video or the testimony at length, but I'm just posing this. If we get back in our office and we look at the video, and the video can be interpreted the way the doctor did, they passed up opportunities to put him in the car or put him sitting down instead of prone out, and that's what killed him. Well, Your Honor, the doctor was not taking into consideration, in my opinion at least, that he's on a four-lane highway. He's already been out in the traffic. He's subjecting not only the officers but himself, the officers. He was in a median, wasn't he? He was, Your Honor, but if he had broken loose, if they had put him in a sitting position or attempted to put him in the backseat of the car and he had broken loose, then they would have had no alternative but to follow him into traffic should he have gone that way. You cite to us Carnaby, where we do say we're going to rely on the video more than witnesses. That's correct, Your Honor. And so what would help me would be, do you know roughly time stamp as to any of the following features? Resistance by him? Roughly where would you say that we look? And then the relevant force, how many of them does the video show were pressing down? Obviously that created a more aggravating circumstance. All right, Your Honor. So crossing over the highway when he's doing that is at roughly on Jennifer Morgan's dash cam video is at 440. Aguirre almost being hit by a car is at 455. The resistance actually is between 455 and 620. At 620 on the video, you can hear Mendez saying that there was a hit and run and stole a car. And at 1015 on the video, he asked for the wagon to start out. Okay. That's very helpful. But in answer to my question about assuming that creates a dangerous situation, a very difficult situation, then how many of them are pushing down on him and what time stamp are we looking at for that? All right. Let me back up for just a minute. If you look at the Gonzales dash cam video, at 625, it shows that it takes four to five officers to take Mr. Aguirre from the hood of the car to the median and prone him out. You say it takes that because he's shown to be resisting them? That's correct. Okay. I mean, you can see them struggling. And that's where, 625? Yes, Your Honor. On the Gonzales dash cam video. And then you can also see on the Gonzales dash cam video that Officer Gonzales does not have his feet pushed all the way up to his buttocks, for the most part. It's not entirely clear the entire time, but it's very clear during certain portions. All right. Now, let me ask you, in response to what Counsel Opposite said, that this position that they had the deceased in here was worse than it was in Aguirre, worse than a hog tie. How do you respond to that? I can't. I do not believe that it's worse than a hog tie. Well, I mean, in other words, what are the factual differences? And what are the medical differences? I mean, I don't know. I mean, I'm just asking you. All right, sir. So on the median, in this particular case, when they get him prone, you can see that there are basically four officers that are involved in holding him down. Officer Mendez, who has his right knee about at his waistline, but most of his weight, and reading his affidavit also and looking at the video, has most of his weight on his left leg. Officer Mendez does, in other words, not putting a lot of weight on Mr. Aguirre's back. He is also, at one point at least, holding Mr. Aguirre's head down because you can see Mr. Aguirre moving his head back and forth on the pavement, so he's trying to protect him there. He's also holding his shoulder down with his left hand. There is Officer Gonzales, who is, according to her testimony, and I believe it's pretty clear on the video, she is actually leaning with her knees on the backs of Mr. Aguirre's legs, thighs, but holding his feet up toward her chest like this, not pushing his feet down toward his buttocks like that. There's the other officers, Officer Jennifer Morgan, who just is basically holding an elbow. And then the other officers, Officer Bettina Arredondo, and she is actually primarily monitoring Mr. Aguirre. She's up there at his face talking to him, asking him what kind of drugs he's taken, which also indicates that they didn't know that previously. And is the one that notices that he—she does notice that he had blue lips, but— Is that the first time they notice he has blue lips? It is, Your Honor. What's the time? Do you have a time? Your Honor, I'm not sure that I do have a time on that. But why wouldn't the minute they see blue lips and he says, I am taking drugs, then they'd have to get the guy off his stomach? Well, he hasn't said that he's taking drugs. But she's asking about it, so she infers it, and she sees blue lips. That's true because what her testimony is, is because she has seen people on drugs before with blue lips with no adverse effects. So it's not—she wasn't overly concerned about that. But the instant that he does stop, and all this time he's talking, he's calling, you know, for his—he's talking, calling for his mother, and he's still pushing up against their attempts to— All right. Now, what kind of conduct, if any, did he engage in prior to his being put in this restraint? The—immediately before, prior to being put in this restraint, is when he was on the hood and he engaged in pushing back up against the officers. You can see his legs where he's trying to gain some leverage to do that, and you can see there are actually only a couple of officers, Mendez and another actually officer that's not a defendant here, engaged in holding him down. You can see that they're starting to have trouble with him, and the other officers then go over—they see it also and go over to assist. So—and Officer Morgan has said that he was very strong, as people on, you know, which we found out in hindsight, on cocaine often are. So that's what he did. That's what prevented him from being put into the back of the police vehicle and being put onto the ground instead. Did the man have any medical history prior to this incident? There's no medical—there's no evidence of that sort of thing in the record, Your Honor, like there was in—I think it was eight years. I mean, sir, as far as the record is concerned, it was the drug condition that he was in that made him susceptible to fatality as a result of this particular position. Drugs only, not a previous condition. I'm sorry, Your Honor? Was it drugs only that made him particularly vulnerable to this position that the police had placed him in? There's no evidence in the autopsy report that he had any enlarged heart or any, you know, blocked arteries or anything like that or COPD. There's nothing in the record that— But his expert—does his expert say that it's primarily— I mean, ordinarily, I mean, a healthy man is not—even a hogtie is not going to affect a healthy man in terms of fatality. So here, what I'm asking, was there anything that resulted in his death other than— I mean, that caused his death in this position other than his consuming drugs? I'm unaware of anything. Okay. That's all. Thank you, sir. Okay. Mr.— May I please— Yes, sir. First, I want to say I disagree. Although I have great respect for opposing counsel, I disagree that, you know, an allegation that he stole a vehicle, that was never—it wasn't one of these things where somebody called in a stolen vehicle. This was after-the-fact sort of deal where they looked at the vehicle and it was reported stolen, but the lady that he was riding with said he had rented that vehicle from somebody else. So there's no actual record facts that he stole this vehicle. It's kind of a red herring that was thrown in there. On the proof of drugs, though, I will tell you that I also disagree with opposing counsel in the sense that Officer Morgan concludes— and it's in Apelli's brief on page four of their brief, and it's mentioned again on page 27 and 34, that she concluded that on her first observation of Mr. Aguirre that she believed he was on drugs. And then as far—and it's also in the record, 693, 694. Arradondo is mentioned about believing he's on drugs, page 9, 15, 32, and 33 of Apelli's brief, record 690. Gonzalez, you can hear her say he's high on something on her own dash cam video at five minutes to five minutes and 20 seconds through that video. And this is before he's on the ground. Right, but I guess on just the balance, danger, I'm just not persuaded. Undisputed, it's a hit and run. He smashes into something, they find the car, and then he leaves. Right. So that's a big problem, and where he leaves to is in the middle of an eight-lane highway. So no one doubts you've got to really restrain this person. So where it comes to me is if they don't hog tie him but they do put him prone, do we have any case law on that? Because I read Gutierrez, and what was put in substantially was that Texas never allows hog ties. But they distinguished the Seventh Circuit Milwaukee case where it's just prone, people holding someone down. What's your best case that holding them down, positionally face down, is equivalent to a hog tie? Well, I would say that it's just the functional reality. I know I'm not asking for common sense. I'm asking for case law. I'm saying a lot of times case law does not have the common sense analysis. I'm not going to pull a case out. Doesn't your medical expert provide a good answer to that? Well, exactly, and I actually pulled some pages. Grant Mittler testified in his report that the prone position and pressure applied to the neck and back of Jesse Aguirre more likely than not restricted Mr. Aguirre's ability to expand his lungs and oxygenate his blood and importantly remove carbon dioxide and maintain a normal pH of his blood. Testified that bending up of Mr. Aguirre's legs in the position they were held while he was in the prone position reduced the venous return to the heart and reduced his cardiac output. The pressure applied to Mr. Aguirre's back more likely than not compressed his vena cava and also contributed to the reduced blood return to his heart and reduced his cardiac output and impaired his ability to correct or keep normal his blood pH. More likely than not, the position of the leg and compression of the back of the neck contributed to lower pH which contributed to Mr. Aguirre's death and inducement of fatal cardiac arrhythmia. Did the doctor offer any opinion as to whether this particular position was fatal to anyone that was put in that position? I don't think he made a general diagnosis to everybody, but he reviewed the video and he did what I just read. I mean, he came to a medical diagnosis that this caused his death. Did he examine the man's body? No, he did not. And just to let you know, the Bexar County medical examiners, when they say excited delirium, it's a weird term, but they actually say that it's a set of symptoms. It's not an actual condition, but it's a set of symptoms. And one of those symptoms that is included in it is a struggle or restraint by police. Again, in Gutierrez's case, you probably read it closely, the footnotes say you can't ever hogtie. Here's what you do instead. So let's assume he's fighting back excessively in the middle of a highway. He's reproved. Just listen to the question. Are you saying they can never put a person prone and pulling legs up? And if so, what case says that? I'm not saying it's not per se unconstitutional, as the case law says. But I would say this is much worse than Gutierrez's, as my co-counsel already stated. But more importantly, the facts are Gutierrez involved violence. Khan involved violence. Hill involved violence. And Pratt involved violence. Fighting officers, kicking them in the groin, grabbing for their guns. Things that are not present here. And to your point, Judge Higgins, I agree that the highway is a dangerous situation. But as the panel held in Garden, Sidon, Lytle versus Bexar County, an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased. And once they have him, and they have all these cars lined up, you can see in the video, these cars are not going highway speed anymore when they're going by him. It is crystal clear. They are going very slow. They are protected by two lanes of traffic. I'm not saying it alleviated every single danger. Some driver could have not been paying attention. But it's not present here. We believe there's enough disputed issues of fact here that this should be going to a jury. They could determine that there's not resistance. Is this the same police department that was involved in Gutierrez? Yes, it is, Your Honor. Thank you for your consideration. Thank you. That concludes our arguments for today. We take these cases under dividement, and this panel will adjourn until 9 o'clock tomorrow morning.